UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————

SHANNA GROVE,

           Plaintiff,           Case No.
                                          Hon.

vs.

WZZM a/k/a WZZM-TV a/k/a WZZM13,
TEGNA, INC., and COMBINED
COMMUNICATIONS OF OKLAHOMA, LLC,

           Defendants.
_____/
James C. Baker (P62668)
Raymond J. Sterling (P34456)
Attorneys for Plaintiff
STERLING ATTORNEYS AT LAW, P.C.
33 Bloomfield Hills Pkwy., Ste. 250
Bloomfield Hills, MI 48304
(248) 644-1500
jbaker@sterlingattorneys.com
rsterling@sterlingattorneys.com
_____/

**COMPLAINT AND JURY DEMAND**

Plaintiff, Shanna Grove, by her attorney James C. Baker of Sterling Attorneys at Law, P.C., for her Complaint against Defendants, WZZM/Tegna/Combined Communications, states:

1. This is an action for sex and gender discrimination and retaliation in violation of Michigan's Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq*.

2. Plaintiff's claims arise out of her employment relationship with Defendants.

3. Plaintiff, Shanna Grove ("plaintiff," "Shanna," "Shanna Grove," or "Ms. Grove") is a citizen of Colorado.

4. Defendant WZZM/WZZM-TV/WZZM13 is an ABC-affiliated television broadcast station licensed to Grand Rapids, Michigan, and serving the Grand Rapids-Kalamazoo-Battle Creek television market.

5. Defendant Tegna, Inc. is a foreign profit corporation incorporated in Delaware, yet it owns and operates WZZM in Grand Rapids, Michigan.

6. Defendant Combined Communications of Oklahoma, Inc. is a foreign limited liability company incorporated in the State of Oklahoma, licensee of television broadcast station WZZM-TV in Grand Rapids, and acting in Grand Rapids, Michigan in part as Plaintiff's employer from March 2018 to February 15, 2021.

**JURISDICTION AND VENUE**

7. Plaintiff was defendants' employee between March 2018 and February 2021.

8. The events at issue substantially occurred at defendants' Grand Rapids, Kent County, Michigan location.

9. The amount in controversy exceeds $75,000 exclusive of interest and costs.

10. This Court has jurisdiction over Plaintiff's claims pursuant to 28 USC 1332 (diversity of citizenship).

## INTRODUCTION AND FACTS

### Grove's Roles

11. Shanna Grove is a woman, a multi-skilled journalist, television news reporter, and anchor.

12. Plaintiff began her career at WZZM in March 2018; she signed her employment agreement with defendants to provide services as a journalist in February 2018.

13. Shanna started anchor role in August 2018, and signed a new contract for that role in April 2019.

14. Plaintiff's employment was involuntarily terminated by defendants on February 15, 2021.

### Information Supporting Plaintiff's Claims

15. Plaintiff was hired in February 2018, and started with WZZM in March 2018.

16. Shanna worked hard, received performance reviews revealing that she was meeting defendants' expectations, and regularly received input from the public showing she was valued talent in the Grand Rapids television market.

17. Plaintiff was promoted after only a year on the job.

18. Plaintiff was aware of rumors of disparate treatment within WZZM, including men being treated differently and better than women.

19. With the onset of the COVID-19 pandemic in 2020, WZZM, its employees, and plaintiff had to make changes to follow safety protocols and instructions.

20. Plaintiff experienced several situations where defendants and defendants' employees were not following COVID protocols.

21. Plaintiff was personally aware the majority of employees who violated COVID-19 protocols were men, yet none of the male offenders were terminated for failing and refusing to follow safety protocols.

22. On November 20, 2020, during a meeting with WZZM's General Manager, News Director, and Executive Producer, plaintiff was informed defendants wanted to expand her presence in the newsroom and in the field.

23. In response, plaintiff reported that she was the only reporter required to physically report to WZZM prior to her shift, despite COVID protocols supporting remote working as much as practicable.

24. Plaintiff also reported that WZZM employees were not quarantining after large events, such as a recent wedding.

25. Plaintiff made several reports to management that male photographers were not following mask-wearing protocols, thus putting reporters and anchors at risk of contracting coronavirus.

26. Another female reporter had also complained to the General Manager about male photographers not wearing masks, after which the General Manager verbally admonished her for complaining; the reporter became seriously infected with coronavirus.

27. Plaintiff complained about contact tracing and exposure by those employees who had physically encountered a COVID-positive person.

28. On information and belief, it was the General Manager who authorized exposed and symptomatic employees to physically report to work without quarantining.

29. During her meeting with the General Manager and others, the GM verbally admonished plaintiff for making her COVID complaints, calling plaintiff "entitled."

**The Incidents Leading to Termination.**

30. On November 25, 2020, plaintiff submitted an ethics complaint to Tegna, claiming disparate treatment of men and women employees, failures by defendants to enforce COVID-19 protocols, inappropriate comments about entitlement by the General Manager, and plaintiff's belief there existed a culture of fear at WZZM.

31. On December 4, 2020, plaintiff reported COVID-19 direct and indirect exposures in the workplace to Tegna's Human Resources Vice President.

32.     Plaintiff and the HR VP spoke by telephone during which time she informed the VP she was fearful of repercussions.

33.     Plaintiff informed HR about the General Manager failing to inform the staff of a COVID-positive employee, and how the GM refused to restrict COVID-19 exposed and/or COVID-positive employees from physically entering WZZM.

34.     Defendant's HR informed plaintiff the General Manager would be counseled on COVID-19 protocols.

35.     On December 8, 2020, plaintiff again reported to HR how a third employee who reported being symptomatic was allowed to physically report to WZZM, and plaintiff reported how the General Manager was refusing to notify his subordinates of positive COVID-19 exposures.

36.     After the December 8 report, the General Manager communicated to plaintiff and others that WZZM had new HR representation due to an apparent conflict of interest, one which plaintiff had reported about on November 25, 2019.

37.     On December 15, 2020, plaintiff emailed HR about retaliation: she was not being given earned anchor opportunities.

38.     Plaintiff also reported how the General Manager was actively trying to discover the identity of who was making reports to Human Resources, and

how the GM had a history of trying to identify anonymous complaints for purposes of singling out and retaliation.

39. Plaintiff also learned that the General Manager informed co-workers he suspected who was making reports to corporate, and how that "pisses him off."

40. In January 2021, plaintiff was still experiencing repercussions from her reporting her concerns to HR.

41. During that time her cat became deathly ill, and having moved from Colorado to Grand Rapids for the WZZM job, plaintiff was the only person who could care for her pet.

42. On January 30 and 31, 2021, plaintiff was forced to take PTO to care for her pet, requiring her to take her cat to the veterinary Emergency Room.

43. While in the vet ER, plaintiff worked on a February "sweeps" story, but was told by her News Director not to work on PTO days; while there was no disciplinary action taken against plaintiff after doing "sweeps" work on a PTO day, plaintiff felt she was being admonished.

44. On February 10 and 11, 2021, plaintiff again required PTO to care for her dying pet, including requesting time off the upcoming weekend as plaintiff's cat was near death.

45. On February 12, 2021, the News Director instructed Plaintiff to report to work as weekend anchor, and told plaintiff she might face a write up for unexcused absence if she missed work.

46. Plaintiff told the News Director she could not leave her pet alone, and she understood that she might face a write-up if she was not excused.

47. Plaintiff did not appear for work on February 13 and 14, because her pet was dying and had to be euthanized, which required Plaintiff's presence.

48. Plaintiff believed the News Director had obtained anchor coverage for the weekend.

49. Plaintiff was aware that a male anchor at WZZM had been given substantial schedule flexibility when his dog was going through medical issues that led to the dog's death.

50. February 15, 2021 was plaintiff's scheduled day off, but she was called to a mandatory meeting via Zoom.

## The Termination.

51. On February 15, 2021, plaintiff was fired.

52. The reasons for termination contradict Ms. Grove's performance for the company, and reveal how a male anchor was treated differently and did not lose his job for same or similar conduct as that allegedly committed by plaintiff.

53. The News Director who delivered the news of plaintiff's termination is a woman, but the General Manager who displayed discriminatory and retaliatory conduct toward plaintiff, is a man.

54. On information and belief, it was the General Manager who decided to terminate plaintiff's employment.

55. Defendants maintain employment policies that promote, encourage, and even mandate employees to bring issues of discrimination to the attention of management or human resources.

56. In late 2020 and in 2021 leading up to her termination, Shanna Grove was reporting safety violations in the workplace, as well she was expressing her concerns of disparate treatment based on sex/gender.

57. Defendants treated plaintiff differently than a male anchor.

58. The General Manager openly criticized and displayed his hostility toward plaintiff for Shanna bringing safety and disparate treatment concerns to the defendants' attention.

59. On February 15, 2021, Shanna Grove's career came to an abrupt end.

## Other Disparate Treatment

60. Throughout her employment, as well as through her termination, defendants engaged in disparate treatment of plaintiff when compared to male employees.

61. During the COVID-19 pandemic, Shanna Grove, a woman, was the only reporter required to physically report to the newsroom before a shift.

62. After requesting a day off in December 2020, WZZM's male General Manager ordered plaintiff to produce a doctor's note supporting the requested time off; men were not similarly mandated.

63. Shanna Grove was not afforded anchoring opportunities because she is a woman.

64. A male anchor suffered the loss of his pet, and through that process was provided work accommodations including unscheduled and/or unreported time off, being paid for time off, and not being disciplined up to and including termination for missing work due to an ill and/or dying pet.

65. The male anchor was not only given special accommodation for the loss of his pet, defendants allowed the man to produce news pieces about his relationship with his pet, including a "sweeps" story, an interview with a Tegna affiliate in Denver, and a recent story about how he adopted another pet.

66. Defendant's male General Manager made derogatory comments to plaintiff regarding his perception that Shanna was entitled because she was a woman.

67. Defendant's male General Manager identified and held plaintiff out as the source for anonymous COVID-19 complaints made to corporate HR, during which time the General Manager admonished plaintiff that reporting her

workplace concerns to defendants was not how she should behave on her first job out of college.

68. Defendants had different and changing objectives and expectations toward Ms. Grove, a woman, than toward men who worked for defendants in a variety of roles.

**Consequences of termination.**

69. With her termination, Shanna Grove suffered lost salary, she lost her benefits package and the intangible benefits of a journalism career, she lost the opportunity for advancement, and she suffers the emotional and mental anguish of knowing she had been let go because she was the victim of sex discrimination and retaliation, because she is a woman.

70. Tegna owns several television stations around the country, such that plaintiff's termination adversely impacts her reputation and future within the broadcast news industry.

## COUNT I
## SEX DISCRIMINATION IN VIOLATION OF THE
## MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT

71. Plaintiff incorporates by reference the allegations made in Paragraphs 1-70, as if fully restated herein.

72. This Court has jurisdiction over these claims pursuant to the Elliott Larsen Civil Rights Act, MCL 37.2101, *et seq.*

73. At all relevant times, plaintiff was an employee of defendants.

74. Plaintiff is a woman.

75. Plaintiff was qualified for her positions, including that of anchor.

76. Plaintiff was treated differently than her male counterparts, including being treated differently than a male anchor.

77. Defendants are employers as defined by the Elliott Larsen Civil Rights Act, MCL 37.2101, *et seq.*

78. The Elliott Larsen Civil Rights Act prohibits an employer from "fail[ing] or refus[ing] to hire or recruit, discharg[ing], or otherwise discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of … sex…. MCL 37.2202(1).

79. The Act prohibits an employer from "limit[ing] … an employee … in any way that deprives or tends to deprive the employee … of an employment opportunity … or otherwise adversely affects the status of an employee … because of … sex…." *Id*.

80. Defendants' conduct toward plaintiff during her employment, including treating her differently than her male counterparts, is a violation of the Elliott Larsen Civil Rights Act.

81. The conduct of defendants in responding to plaintiff's reasonable and justified concerns over conduct of many of the men at WZZM is evidence of discrimination.

82. Defendants' conduct toward plaintiff, including applying different employment objectives/expectations toward her than toward men, and terminating plaintiff for a first-offense purported scheduling violation when a male anchor was afforded flexibility under same or very similar circumstances, are examples of sex discrimination committed by defendants.

83. Defendants' alleged reasons for its conduct toward plaintiff, including terminating plaintiff for the different reasons stated, were pretext for sex discrimination.

84. Plaintiff's sex was a factor in defendants' employment decisions, including involuntarily terminating her from employment.

85. As a direct and proximate result of defendants' discrimination, plaintiff has suffered injuries and is entitled to compensation for any lost wages, her lost tangible and intangible benefits of employment, her emotional distress and mental anguish from losing a career, and other incidental, consequential, and exemplary damages, including attorney fees and interest as an element of damages, statutory attorney fees, and costs.

## COUNT II
## RETALIATION IN VIOLATION OF THE
## MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT

86. Plaintiff incorporates by reference the allegations made in Paragraphs 1-85, as if fully restated herein.

87. The Elliott-Larsen Civil Rights Act states a "person shall not … retaliate … against a person because the person has opposed a violation of th[e] act…." MCL 37.2701(a).

88. Defendants are a "person" as defined by the Act.

89. Plaintiff opposed disparate employment practices and conduct within defendants' company.

90. Plaintiff opposed violations of safety protocols relating to COVID-19, including reporting evidence that men were engaging in and not being held accountable for violations of workplace safety regarding COVID restrictions and personal protective equipment.

91. Plaintiff's opposition culminated in her involuntary discharge from defendants.

92. Defendants' conduct toward plaintiff revealed an intent to retaliate against plaintiff because she is a woman.

93. Defendants illegally retaliated against plaintiff.

## DAMAGES

94. Plaintiff incorporates by reference the allegations made in Paragraphs 1-93, as if fully restated herein.

95. As a direct and proximate result of defendants' conduct, plaintiff has suffered injuries and is entitled to:

    A.    compensation for her loss of wages;

      B.      compensation for her loss of monetary benefits and bonuses;

      C.      compensation for her loss of fringe benefits;

      D.      compensation based on her earning potential;

      D.      her emotional distress and other non-economic damages; and

      E.      other incidental and consequential damages, including attorney fees.

WHEREFORE, Plaintiff Shanna Grove, by her attorneys Sterling Attorneys at Law, P.C., respectfully requests that this Honorable Court enter judgment against defendants, jointly, severally, jointly and severally, in whatever amount in excess of Seventy-Five Thousand Dollars ($75,000) plaintiff is found to be entitled, together with liquidated and/or exemplary damages, reinstatement, attorney fees and interest as an element of damages, statutory interest and attorney fees, and costs.

      Respectfully submitted,

      STERLING ATTORNEYS AT LAW, P.C.

      By: /s/James C. Baker
            James C. Baker (P62668)
            Attorney for Plaintiff
            33 Bloomfield Hills Pkwy., Ste. 250
            Bloomfield Hills, MI 48304
            (248) 644-1500
            jbaker@sterlingattorneys.com

Dated: April 29, 2021