UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHANNA GROVE,

    Plaintiff,

v.

WZZM a/k/a WZZM-TV a/k/a WZZM13, et al.,

    Defendants.

_____/

Case No. 1:21-cv-354

Hon. Hala Y. Jarbou

## OPINION

Plaintiff Shanna Grove brings this action under diversity jurisdiction against her former employer, WZZM. She alleges that WZZM discriminated against her by treating her differently from her male counterparts and then terminating her. She also contends that WZZM retaliated against her for complaining about the different standards for men and women at her workplace. She asserts discrimination and retaliation claims under Michigan's Elliot-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101, et seq. Defendants move for summary judgment. For the reasons herein, the Court will grant their motion.

### I. BACKGROUND

The following is a summary of the facts in the record, viewing the evidence in a light most favorable to Grove.

**A. Defendants**

Defendant WZZM is a broadcast television station located in Grand Rapids, Michigan. WZZM is owned and operated by Defendant TEGNA, Inc.

**B. Grove's Position & Supervisor**

Julie Flynn, the News Director at WZZM, hired Grove for the position of Multi-Skilled Journalist in February 2018, and Grove began her work in March 2018. (Grove Dep. 10, ECF No. 28-2; Flynn Dep. 19, ECF No. 28-3.) In her role, Grove would "pitch story ideas," conduct recorded interviews, and compose news stories. (*Id.*) Occasionally, she was given the opportunity to be an anchor on a weekday. (Flynn Dep. 21-22.) In April 2019, her role expanded. She became a regular anchor on the weekends. (*Id.* at 25.) WZZM airs the local news on the weekends from 6:00 am to 8:00 am on Saturdays, and on Sundays from 6:00 am to 8:00 am and 9:00 am to 10:00 am. (Baylog Dep. 16, ECF No. 28-1.)

Dan Baylog became the General Manager at WZZM shortly after Grove became a weekend anchor, but Flynn was Grove's direct supervisor during Grove's entire time at WZZM. (Flynn Dep. 26, 29.)

**C. Grove's Performance Issues**

Grove received annual performance reviews from Flynn. Tardiness was a recurring issue. In Grove's 2019 performance review,[1] she received a score of "meets expectations." (2019 TEGNA Performance Review, ECF No. 28-2, PageID.527.) But Flynn gave her the following admonishment:

> Your weekend shift is just as important as during the week (if not more). We have had issues throughout the year with you coming in late or leaving way before your shift ends to catch a train. I have had to talk with you a couple times about this. Please be committed every weekend to working your entire shift, which includes shooting vo's and vo/sot's after the show. With a new meteorologist starting in the morning, we will be relying on you even more to help lead the weekend crew. If we are down a weekend producer, we need[] you to step in and help. It's not realistic to have another producer fill-in every time, sometimes it will be a photographer.

---

[1] The 2019 review covered Grove's work from January 1, 2019, through December 31, 2019. (2019 TEGNA Performance Review, PageID.527.)

2

(*Id.*, PageID.531.)

Flynn's comments referred to an incident in 2019 when Grove left her shift early to catch a train without informing her executive producer ahead of time that she would need to do so. (Grove Dep. 38-40.) The producer complained that, because there is a small crew on the weekends, another employee had to change her plans due to Grove's early departure. (*Id.* at 38; Flynn Decl. ¶ 5, ECF No. 28-4.)

That same year, another employee told Flynn that Grove regularly arrived over an hour late for her scheduled weekend shift. (Flynn Decl. ¶ 4.)

In Grove's 2020 performance review, she received a score of "meets some expectations." (2020 TEGNA Performance Review, ECF No. 28-2, PageID.534.) Flynn again raised the issue of Grove's tardiness:

> In last year's review we talked about your schedule and times you were coming in late or leaving early. In 2020, conversations over your schedule and expectations intensified, especially in the back half of the year. Swipe reports indicated that you were repeatedly tardy to your shift. Your start time is 3:00 am for a reason. You are needed to help craft the newscasts and lead the team. If you are super late, how much can you actually change and do for the newscasts? We are continuing to monitor your arrival times not just on the weekend but during the week as well. One of the biggest examples was on election night. Myself and Dan waited to do a debrief with the morning team. You were 35 minutes late and we waited to start the meeting. After the newscasts there are still many hours left in your shift. We want to see that you are really pitching in and utilizing that time. . . . .

(*Id.*, PageID.538-539.)

Some of the "intensified" conversations referenced by Flynn occurred in November 2020. That month, two producers on the weekday morning shift complained to Flynn and Executive Producer Brad Ivey about what they perceived as "unfair and more favorable special treatment" for Grove because they said she was routinely late for the start of her shift and would sometimes arrive right before the start of her live segment. (Flynn Decl. ¶ 6.) Flynn told Baylog about these

3

complaints and then held a Zoom meeting with Grove, Ivey, and Baylog on the morning of November 20, 2020. (*Id.*) Grove recorded this meeting.

At the meeting, Grove explained that she was trying to limit her time in the building due to her concerns about exposure to COVID-19. (*See* Ex. A to Baylog Decl., Audio of Morning November 20, 2020 Zoom Meeting, ECF No. 28-5.) But Baylog told her that, as a "consumer-facing talent for WZZM," she "need[s] to be in the building." (*Id.*) He did not want other employees to "feel that there's favoritism or different rules for different people," so his expectation was that she would "be there at the time [she is] assigned to be there[.]" (*Id.*) Baylog also expressed his opinion that Grove's actions stemmed from a sense of "entitlement."

> I don't want to foster a culture of entitlement or favoritism and that's how it's being perceived by other folks and you are part of a team and the expectation is that you're going to be in the building and I'm really disappointed. I was asked to be on this call. I don't want to deal with things like this so I understand your perspective about not wanting to be in the building but you're being asked to be in the building. That's a part of your responsibility as being an anchor at WZZM, and I don't want to hear about you showing up at 4:45 in the morning to go on the air at 5. And it's interesting that there's an issue about being in the building with an assigned seat with a mask on, between plexiglass, and hand sanitizer right behind you and you're totally cool with coming to anchor on Saturday and Sunday. I feel like there is a misguided notion of I don't know what other word to use other than entitlement. This is your first TV job out of college this is not how you should be behaving, and I don't want to be on a call like this again and with that I'm going to go.

(*Id.*; *see* Baylog Decl. ¶ 5, ECF No. 28-5 (transcribing Baylog's remarks).)

Later that afternoon, Flynn held a Zoom meeting with Grove and Anna Avelar, TEGNA's "HR business partner assigned to WZZM." (Flynn Decl. ¶ 7.) At that meeting, which Grove recorded, Flynn and Avelar asked Grove to expand on her concerns about being in the building. Grove reiterated that she wanted to limit exposure to other people due to COVID-19 by working from home as much as possible. (*See* Ex. B to Flynn Decl., Audio of Afternoon November 20, 2020 Zoom Meeting, ECF No. 28-4.) She expressed concern that some employees (photographers, in particular) were not wearing masks as required. And she stated that Baylog's comments at the

4

morning meeting were "very personal," "disappointing," and did not address or validate her "health and safety concerns." (*Id.*) Flynn and Avelar stated that they were addressing issues with mask wearing as they arose, and Avelar indicated that she wanted their meeting to focus on Grove's health and safety concerns rather than Baylog's comments.

Flynn said that it was "most crucial" for Grove to be in the building at the *start* of her shift because the producers did not know when to expect her arrival. (*Id.*) Ivey had told Flynn that Grove should arrive at the building at the same time as others on the team, so Flynn said that Grove should arrive on time for her shift:

> It's just the expectation of someone in your role needs to be in the building at 3:30, that's your scheduled time. It can't be a different time every day that you're showing up because that's very confusing for the whole team like you know I have a question when is Shanna going to be here. So that's just what I'm asking for we can limit your time after the show but during the show it's all hands-on deck and we need you here at 3:30, which is your start time. And that's the same with the weekends, whenever your start time is, that's when you need to be here helping.

(*Id.*; *see* Flynn Decl. ¶ 8 (transcribing her remarks).)

Flynn reinforced her expectations of Grove in an email that she sent to Grove immediately after the meeting. (11/20/2020 Flynn Email, ECF No. 28-4, PageID.767 ("Going forward, recapping expectations, you will report to the newsroom and start your day at your scheduled time. This is 3:30 am during the week, and 3:00 am on the weekends.").)

**D. Grove's Ethics Complaint**

On November 25, 2020, Grove raised similar concerns about working in the building in an anonymous ethics complaint that she submitted to TEGNA in accordance with its ethics policy. (Grove Dep. 89-90.) The complaint said it was "about" Baylog and addressed "two major grievances: the station's response to the worsening pandemic, and the way [Grove] was personally attacked for voicing [her] concerns, which management expressly asked [her] about." (11/25/2020 Ethics Complaint, ECF No. 28-2, PageID.569.)

5

In her ethics complaint, Grove stated that she had tried to limit the amount of time she spent working in the building due to the pandemic. After the pandemic started, she worked from home for her reporting shifts on weekdays, and then worked in the building "as was absolutely necessary as a solo anchor on weekends." (*Id.*) But in September 2020, Baylog asked her to return to the building for her three weekday reporting shifts "to have a better quality shot." (*Id.*) She followed his instruction, but she continued to try to limit her time in the building on the "front and back end[s]" of her shifts. (*Id.*) She did not believe that the quality of her work suffered during this period. And considering the "increasingly dire" COVID-19 positivity rate in Kent County and the lack of full compliance by WZZM's employees with its COVID-19 protocols, she did not believe that spending additional time in the building was worth the risk. (*Id.*, PageID.570-571.)

She then explained that Baylog told her during a November 20, 2020 Zoom meeting that she needed to be in the building at the start of her shift. She described several of his comments during that meeting, including his reference to the notion of "entitlement," as evidence that her health and safety concerns "weren't being properly addressed." (*Id.*, PageID.572.) And she complained that, during a subsequent call with HR, "[i]t was made very clear the purpose of the call was not to address the inappropriate way in which Baylog spoke to [her]. It was to discuss COVID protocols." (*Id.*) She believed that HR and Baylog had a "conflict of interest" due to their "professional history and friendship." (*Id.*) And she reported that "fellow co-workers" had told her about "run-ins" with Baylog in which he spoke to them in a "condescending, belittling, [and] threatening manner[.]" (*Id.*) She wanted her ethics complaint to "elicit change" to make the culture at WZZM a more "positive" one. (*Id.*)

6

Melissa Jones, TEGNA's Vice President for Human Resources, responded to Grove's complaint, communicating with Grove by email and speaking over the telephone. (Jones Decl. ¶ 4, ECF No. 28-7.) Grove did not reveal her identity until after her termination. (*Id.* ¶ 6.) In several of Grove's emails, she mentioned that she had been exposed to COVID-19 by a male photographer who did not wear his mask. (*See, e.g.*, 12/4/2020 Grove Anonymous Emails, ECF No. 28-7, PageID.841, 862.) She also mentioned a male director who was "actively coughing during his shift" in the studio. (*Id.*, PageID.958.) When speaking with Jones over the phone, Grove said that there were "other instances of women being belittled" and that "other females had gone forward to report things and nothing happened as a result." (Grove Dep. 106-07.)

Baylog learned about this complaint in December 2020; he suspected that Grove might have filed it. (Baylog Dep. 23, 25, 35.) He met with Grove in late December 2020 to accommodate her concerns about being in the building. (Grove Dep. 150-51.) On December 23, 2020, he gave her permission to work from home on weekdays for three weeks in January. (*Id.* at 151-52.)

Flynn, however, was not aware of Grove's ethics complaint. (Flynn Dep. 48-49.)

**E. Grove's Continued Performance Issues**

Even after Flynn's conversations with Grove in November 2020, Flynn continued receiving complaints about Grove's tardiness. On December 29, 2020, Flynn met with Managing Editor Katie Sakala and Producer Abbie Pall, who worked with Grove on the weekend news program. Pall told Flynn that Grove was arriving to work after 4:00 am and never checked in with Pall when she arrived. (Flynn Decl. ¶ 10.) And Sakala confirmed that Grove was not arriving at 3:00 am.[2] (*Id.*) Flynn told Sakala to send Grove an email stating her expectations. Sakala did so. (12/29/2020 Sakala Email, ECF No. 28-2, PageID.544-545.)

---

[2] Grove argues that the Court should not consider these statements to Flynn because they are hearsay. But Defendants respond that these statements are relevant to Flynn's state of mind. They are not offered to show to the truth of the

7

Flynn decided to investigate the issue further, so she asked Baylog to prepare a "swipe report" showing the times when Grove used her security badge to enter the building each day from November 1, 2020, to the most recent date. (Flynn Decl. ¶ 12.) Baylog sent Flynn that report on January 4, 2021. (*Id.* ¶ 13.) It showed that Grove swiped into the building later than her scheduled arrival time on 20 out of 33 workdays. (*Id.*) Some of those late arrivals occurred after their meeting with Grove on November 20, 2020. (*See* Swipe Rep., ECF No. 28-4, PageID.773.) Baylog told Flynn that he was "concerned" because Grove's "behavior is not in line with our expectations of this role." (1/4/2021 Baylog Email, ECF No. 28-4, PageID.772.) Flynn responded that "[t]his is definitely not meeting expectations" because Grove "has been told multiple times that her shift during the week is 3:30-12:30, and on the weekends 3:00-12:00pm." (1/4/2021 Flynn Email, ECF No. 28-4, PageID.774.) Flynn indicated that they would "need to discuss all of this with [Alexandra Kroen]," the HR business partner for WZZM at that time. (*Id.*; *see* Grove Dep. 56 (discussing Kroen's role).)

Flynn held a meeting with Kroen and Grove on January 7, 2021, to discuss Grove's conduct. Grove recorded the meeting. At the meeting, Flynn told Grove:

> I just want a clean slate on your weekend morning schedule. Because I feel like this kind of comes up every several months of just reevaluating what is your schedule, when are you arriving, when are you leaving, and all that kind of stuff. And what was agreed upon, the set expectation is you are three to noon. Especially now, I know Katie talked to you last week and followed up with an email about, we have Patrick just started and it is really crucial that we stick to that 3:00 AM start time. So I was very disappointed to see that right after that email and that discussion that this last Saturday and Sunday, you were really late both days. And then in pulling a swipe report, which is obviously something I don't want to do, but it had to be done, just looking at this past weekend and then several weekends prior to that, you are consistently late. So obviously that tardiness we need to correct that right now because that is just not acceptable, coming in at 3:28 on Saturday, 3:35

---

matter asserted (i.e., that Grove regularly arrived to work after her scheduled time), but to show that Flynn had received complaints from others about Grove's tardiness. As Grove's supervisor and as a decisionmaker in Grove's termination, Flynn could consider complaints from other employees about Grove's performance. When offered to explain Flynn's perception of Grove's performance, evidence of what Flynn heard from others is not hearsay.

8

> on Sunday, and then there were some Saturdays and Sundays prior to that that were even later, in the 4:30, 4:45. That is just not acceptable. So we're going to continue to monitor it. Right now this is just a warning and I just want a clean slate, an understanding of your schedule and then if it continues to be a problem in the future then next time you are late, we'll have to write you up. And if it continues to be a problem, we'll continue talking about it and see what the next step is but it's just something we have to correct.

(Ex. F to Flynn Decl., Audio of January 7, 2021 Call, ECF No. 28-4; *see* Flynn Decl. ¶ 16 (transcribing part of the call).) In response, Grove said that she had been late the previous weekend because she was taking care of her cat, which had "UTI and pancreatitis." (*Id.*)

After their meeting, Flynn sent Grove an email summarizing her expectations:

> Your schedule during the weekends is 3:00am - 12pm. Tardiness has become a problem, as evident from a swipe report. Our expectation is for you to arrive on time. Today you were issued a verbal warning. The next time you are late to your shift we will have to move forward with formal disciplinary action.

(1/7/2021 Flynn Email, ECF No. 28-2, PageID.546.)

On January 18, 2021, Grove told Ivey that she could not come to work that morning to shoot a special segment because her cat was ill and she might need to take him to the hospital. (Grove Dep. 60-61.) The following day, Ivey told Flynn what had happened. According to Flynn, Ivey had to scramble to find a replacement for Grove. (Flynn Decl. ¶ 18.)

**F. Events Leading to Grove's Termination**

Grove requested paid time off to care for her sick cat on January 30 and 31, 2021, and February 10 and 11, 2021. Flynn approved these requests. (Flynn Decl. ¶ 19; Grove Dep. 62-63.) On the afternoon of Thursday, February 11, 2021, Grove asked Flynn for permission to work from home another day to continue caring for her cat. (Grove Dep. 64.) Flynn denied Grove's request, telling her that she had already taken a lot of time off; the station "needed her to be in the building on time for her weekend shift." (Flynn Decl. ¶ 20.) Flynn followed up with an email reiterating her expectations. She told Grove, "We need you in the building at 3 am on Saturday and Sundays

9

to help with the newscasts. . . . [W]e can't accommodate staying in every weekday or coming in later on the weekend." (2/11/2021 Flynn Email, ECF No. 28-4, PageID.782.)

On Friday, February 12, Grove again asked Flynn for time off on Saturday and Sunday. Flynn again denied this request, telling Grove in a phone conversation that she expected Grove to report to work at the start of her shift on Saturday and Sunday and that any absence would be unexcused. (Grove Dep. 66; Flynn Decl. ¶ 23.) Flynn said Grove "could possibly be written up" for taking an unexcused absence. (*Id.*; *see* Flynn Dep. 71.) Grove recalls "agreeing to an unexcused absence," effectively telling Flynn that she would not be working that weekend. (*Id.* at 68.) And she did not show up for work that Saturday or Sunday. The producer for the weekend shift texted her shortly before 4:00 am on Saturday morning, asking if she would be anchoring. (*Id.* at 112.) She responded over an hour later, telling him she was not coming in on Saturday or Sunday. (*Id.*)

Later that morning, Flynn sent Grove an email, stating:

I called you at 10:47am, but you did not answer. You did not show up for your shift this morning, leaving the team scrambling to find a replacement. When we spoke yesterday, I informed you that your multiple absences have put a strain on our team and explained that you are needed both Saturday and Sunday. I also said that the unapproved days off would result in disciplinary action. You indicated to Patrick that you were going to be out tomorrow. I expect you to report into the station tomorrow. If you are not coming in, I need to know about it to make a plan. If I don't hear from you by 5pm today then I will expect that you are moving forward with an unscheduled absence and I will need to schedule a fill in to support our business needs.

(2/13/2021 Flynn Email, ECF No. 28-2, PageID.553.)

Grove replied, "I was clear in our conversation on Friday that I accepted your terms for an unexcused absence Saturday and Sunday, as that was the only recourse I was given." (2/13/2021 Grove Email, ECF No. 28-2, PageID.553.)

10

Over the next two days, Flynn consulted with Kroen and decided to terminate Grove. (Flynn Dep. 43-44.) Flynn had the sole authority to hire or fire Grove. (Baylog Dep. 19.) She told Baylog what she had decided. (Flynn Dep. 44.) He supported her decision. (Baylog Dep. 19.)

Flynn informed Grove of her termination on Monday, February 15, 2021. (*See* Flynn Text Message, ECF No. 28-4, PageID.792.) That termination was effective immediately. (*Id.*)

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* at 249. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## III. ANALYSIS

### A. Discrimination

Grove claims that Defendants discriminated against her on account of her sex when they terminated her. The ELCRA prohibits employers from discriminating against individuals with respect to employment because of sex. Mich. Comp. Laws § 37.2202(1)(a). Grove offers no direct evidence of sex discrimination. There is no evidence that Defendants expressly considered her

sex as a factor when terminating her.  There is also no evidence of gender-related bias in any comments made by WZZM employees about Grove.[3]

Grove can establish discrimination using indirect evidence under the burden-shifting approach in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (Mich. 2001).  Under this approach, Grove must first establish a prima facie case.  *White v. Dep't of Transp.*, 964 N.W.2d 88, 92 (Mich. Ct. App. 2020).  In other words, she must provide evidence that is "'sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by [her] employer[.]'" *Hazle*, 628 N.W.2d at 522 (quoting *Lytle v. Malady*, 579 N.W.2d 906, 916 (Mich. 1998)).

"[O]nce a plaintiff establishes a prima facie case of discrimination, the defendant has the opportunity to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." *Hazle*, 628 N.W.2d at 521.  "If the defendant gives a legitimate, nondiscriminatory reason for the employment decision, the presumption of discrimination is rebutted, 'and the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination.'" *White*, 964 N.W.2d at 93 (quoting *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 193 (Mich. 2003)).

One of the ways that Grove can establish a prima facie case of discrimination is by proving that "'she was a member of a class entitled to protection under the statute and that, for the same or similar conduct, she was treated differently than a man.  The crux of a sex discrimination case is that similarly situated persons have been treated differently because of their sex.'" *Major v. Vill.*

---

[3] Grove characterizes Baylog's statements at the November 20, 2020 Zoom meeting as telling "Plaintiff, a woman, to know her place." (Pl.'s Resp. Br. 24.)  But his statements speak for themselves; there is no hint of gender-related animus or bias in his comments.  He did not, as Grove contends in her brief, call her an "entitled woman." (*Id.*) He did not refer to her gender at all.

*of Newberry*, 892 N.W.2d 402, 413 (Mich. Ct. App. 2016) (quoting *Marsh v. Dep't of Civil Serv.*, 433 N.W.2d 820, 823 (Mich. Ct. App. 1988)).

Defendants argue that Grove cannot show that she was treated differently from a similarly situated male employee. A similarly situated employee is one who is "'nearly identical' to the plaintiff in all relevant respects." *Hecht v. Nat'l Heritage Academies, Inc.*, 886 N.W.2d 135, 147 (Mich. 2016) (quoting *Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64, 70 (Mich. 1997)). A relevant factor when comparing employees is the seriousness of their conduct. *See Williams v. Dep't of Health & Hum. Servs.*, No. 05-5301, 2021 WL 5027962, at *5 (Mich. Ct. App. Oct. 28, 2021). Other relevant factors include whether the employees dealt with the same supervisor or were subject to the same standards of conduct. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (cited in *Williams*).

Grove points to Kirk Montgomery, a male anchor at WZZM who took time off from work to care for an ill pet and who was not terminated. But as Grove acknowledges, Montgomery's three days of leave were approved by WZZM. (*See* Flynn Dep. 82.) And like Montgomery, Grove also received several days of leave to care for her pet. But unlike Montgomery, Grove took an unexcused absence after being told by her supervisor to report to work. Her conduct was more serious. In that respect, she is not similarly situated with Montgomery.

Grove also points to two male employees who purportedly had "more issues than tardiness" and were given "repeated attempts under Defendants' progressive discipline policy to correct their behaviors." (Pl.'s Resp. Br. 16, ECF No. 33.) But Grove does not attempt to explain her argument using the evidence she has provided. It is not the Court's responsibility to "put flesh on [the] bones" of her arguments. *McPherson v. Kelsey*, 125 F.3d 989, 996 (6th Cir. 1997). And the Court

need not "*sua sponte* comb the record from the partisan perspective of an advocate for the non-moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 410 (6th Cir. 1992).

At any rate, Grove's evidence does not support her case. One of the employees, Phil Dawson, was a Multi-Skilled Journalist. His 2017 performance review indicates that he was consistently late for work. (ECF No. 33-4, PageID.1069.) His 2018 review indicates the same; he was arriving late for work and missing afternoon editorial meetings. (*Id.*, PageID.1075.) In August 2019, Baylog told him to show up for those meetings. (8/26/2019 Baylog Email, ECF No. 33-4, PageID.1079.) On October 21, 2019, Flynn gave Dawson a "final written warning" instructing him to attend the editorial meetings and telling him that continued violation of company policies could result in "further disciplinary action up to and including termination." (10/21/2019 Flynn Letter, ECF No. 33-4, PageID.1081.) On November 21, 2019, Dawson was "loud and disrespectful" at an editorial meeting, so Baylog suspended him pending an investigation. (Notes, ECF No. 33-4, PageID.1083.) Flynn subsequently terminated him for insubordinate behavior and for working in the parking lot when he was supposed to be in the building. (Flynn Dep. 85-86.)

Grove was not similarly situated to Dawson. For one thing, Grove was an anchor whereas Dawson was a Multi-Skilled Journalist. In her role as weekend anchor, WZZM relied upon Grove for its weekend broadcasts. Grove received repeated admonitions about showing up for work on time because the performance and perceptions of the rest of her team depended upon her punctuality. Grove does not provide similar evidence about Dawson's failure to attend the editorial meetings. Furthermore, Grove did not merely miss some meetings; she took an unexcused absence for two full days after her supervisor expressly denied her leave request. Grove does not contend that Dawson did the same thing.

14

In addition, it is difficult to say that WZZM treated Dawson differently from Grove. Both were terminated after failing to heed several warnings about their conduct. Grove complains that, unlike Dawson, she did not receive the progressive discipline set forth in WZZM's policies. She apparently refers to the fact that Dawson received a "final written warning" whereas Grove did not. But Grove did receive several admonishments about her attendance issues, both verbally and in writing. And the day before she took her unexcused leave of absence, she understood that she would face discipline if she did not report to work.[4] WZZM's disciplinary policy did not require it to follow any particular steps before terminating an employee. According to that policy, "disciplinary action may include any or all of the following actions *in any sequence* (depending on the totality of the circumstances): verbal warning, written warning, suspension without pay, and/or dismissal. In some instances, immediate dismissal may be appropriate." (TEGNA Human Resources Policies, ECF No. 28-2, PageID.497.) Thus, Grove's reliance on Dawson as a comparator is misplaced.

Another employee mentioned by Grove is Amir Abbas, who apparently received an admonishment from Flynn for working overtime hours in October 2020 without seeking approval from his supervisors. (*See* 10/5/2020 Flynn Email, ECF No. 33-5, PageID.1100.) Another email from February 19, 2021, alludes to "unacceptable behavior" by Abbas during that week, including leaving the "news team scrambling" by not checking with the producer to "have [his] scripts approved," and "fail[ing] to get any new b[-]roll or standups when [he was] the lead story[.]" (2/19/2021 Flynn Email, ECF No. 33-5, PageID.1102.) The email warned him that "further similar behavior" would be a "breach of [his] agreement" and subject him to "immediate termination."

---

[4] Grove contends that "Defendants expressly told Plaintiff she would face written discipline *only* if she took time off to care for her beloved pet[.]" (Pl.'s Resp. Br. 20 (emphasis added).) No evidence supports that assertion. Neither Grove nor Flynn testified that Flynn said the "only" discipline Grove could receive was a written warning.

(*Id.*)  Grove does not indicate what position Abbas held or why he is similar to her in all relevant respects.  He did not take an unexcused leave of absence.  And the evidence provided indicates that Grove's performance issues lasted for a longer period of time and were the subject of more warnings than the issues involving Abbas.  Thus, Abbas is not similarly situated.

Finally, Grove mentions a producer named Yousef, who Flynn terminated in his first week of employment due to "multiple call-offs" that week.  (Flynn Dep. 104-05.)  This evidence supports Defendants more than it does Grove.  It suggests that Flynn terminated a male employee with little or no warning for conduct similar to Grove's (i.e., not showing up for work on multiple days in one week).

In short, Grove has not established that she was treated differently from a similarly situated male employee.  No other evidence permits a reasonable inference of unlawful discrimination on account of her sex.  Accordingly, Grove has not established her prima facie case.  In other words, the evidence does not create a genuine dispute of fact as to whether Grove's sex was a motivating factor in her termination.  Thus, Defendants are entitled to summary judgment on this claim.

### B. Retaliation

The ELCRA prohibits retaliation against an employee for engaging in a protected activity, such as opposing a violation of the ELCRA.  It provides that a person may not

> [r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

Mich. Comp. Laws § 37.2701(a).

Grove can prove a retaliation claim through indirect evidence in the same manner as a discrimination claim.  She has failed to do so here.

> [T]o establish a prima facie case of unlawful retaliation under the Civil Rights Act, a plaintiff must show (1) that he engaged in a protected activity; (2) that this was

16

> known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*El-Khalil v. Oakwood Healthcare, Inc.*, 934 N.W.2d 665, 670-71 (Mich. 2019) (quoting *Rymal v. Baergen*, 686 N.W.2d 241 (Mich. Ct. App. 2004)).

### 1. Protected Activity

Defendants note that Grove did not engage in any protected activity. She filed an anonymous ethics complaint regarding Baylog's statements to her and regarding WZZM's expectation that she return to the office in spite of the risk that she might be exposed to COVID-19. None of her allegations in that complaint, or in her follow-up communications with Jones, suggested a violation of the ELCRA. None of them alleged discrimination or harassment on the basis of sex or any other protected characteristic. Grove asserts that she complained that "men were allowed to defy COVID-19 protocols with impunity" (Pl.'s Resp. Br. 3), but the record reveals that she complained about instances where certain men did not comply with COVID-19 safety protocols. She did not contend that women were treated differently from men. She also told Jones about instances where women were "belittled," but Grove does not explain how that conduct could amount to a violation of the ELCRA, such that a complaint about it would be protected activity.

Similarly, when Grove raised concerns to Flynn and others on November 20, 2020, about her desire not to be in the building, she referred to photographers who did not wear masks, but she did not suggest that women were treated differently from men. Accordingly, she did not "oppose" or complain about a violation of the ELCRA. Absent protected conduct, Grove cannot establish a retaliation claim under the ELCRA.

### 2. Causal Connection

In addition, there is no evidence of a causal connection between Grove's purportedly protected activity and her termination. There is no genuine dispute that Flynn made the decision to terminate Grove. There is no non-speculative evidence that Flynn was aware of any protected activity by Grove before she decided to terminate Grove. Flynn was not aware of Grove's ethics complaint or of any communications between Grove and Jones. Grove's statements to Flynn about Baylog's comments and about the practices of other employees with regard to COVID-19 protocols did not suggest an ELCRA violation. "An employment decision cannot be caused by protected activity if the decision-maker did not know about the protected activity." *Crane v. Mary Free Bed Rehab. Hosp.*, 634 F. App'x 518, 526 (6th Cir. 2015). To surmount this problem, Grove apparently contends that Baylog influenced the decision to terminate her, but no evidence supports that contention. The undisputed evidence indicates that Flynn had the sole authority to terminate Grove, and she made her decision before speaking with Baylog. She told him about her decision and he supported it.

Moreover, even if Flynn was aware of any complaints by Grove about discriminatory treatment or harassment of women at WZZM, there is no evidence from which a reasonable juror could infer that such complaints motivated the decision to terminate Grove. To prove her case, Grove must "'show something more than merely a coincidence in time between protected activity and adverse employment action.'" *Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 660 (Mich. 2005) (quoting *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 473 (Mich. 2003)). She has not made that showing. Grove was late for work on many occasions despite several instructions from her supervisor to arrive on time for her shifts. And after that same supervisor expressly and repeatedly denied Grove's request to take a leave of absence, telling her

that WZZM could not accommodate her request, Grove took one anyway. That conduct motivated Grove's termination, not any complaints that she had made a couple of months earlier.

## IV. CONCLUSION

In summary, the Court will grant Defendants' motion for summary judgment and dismiss the case.

An order and judgment will enter consistent with this Opinion.

Dated: August 29, 2022               /s/ Hala Y. Jarbou
                                     HALA Y. JARBOU
                                     CHIEF UNITED STATES DISTRICT JUDGE